**Weisbrod Matteis & Copley**
Stephen R. Parkinson, WSBA 2111
Stephen A. Weisbrod, WSBA 57821
Thomas R. Oster, WSBA 52880
506 2nd Avenue, Suite 1400
Seattle, Washington 98104
(206) 990-0390

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF WASHINGTON**

| | |
|---|---|
| WEST PRAIRIE VILLAGE MHP, LLC, and CONWIN ENTERPRISES, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>3M COMPANY (f/k/a Minnesota Mining Manufacturing, Co.); TYCO FIRE PRODUCTS LP (successor-in-interest to the Ansul Company); AGC, INC. (f/k/a Asahi Glass Co., Ltd.); AGC CHEMICALS AMERICAS, Inc.; AMEREX CORPORATION; ARCHROMA MANAGEMENT LLC; ARCHROMA U.S., INC.; ARKEMA INC.; BASF CORPORATION; BUCKEYE FIRE EQUIPMENT COMPANY; CARRIER GLOBAL CORPORATION; CHEMDESIGN PRODUCTS, INC.; CHEMGUARD, INC.; CHEMICALS INCORPORATED; THE CHEMOURS COMPANY; THE CHEMOURS | Case No. ___________________ |

COMPANY FC, LLC; CHUBB FIRE, LTD.; CLARIANT CORPORATION; CORTEVA, INC.; DAIKIN AMERICA; DEEPWATER CHEMICALS, INC.; DUPONT DE NEMOURS, INC.; DYNAX CORPORATION; E.I. DU PONT DE NEMOURS AND COMPANY; KIDDE- FENWAL, INC.; KIDDE PLC, INC.; NATION FORD CHEMICAL COMPANY; NATIONAL FOAM, INC. (successor-in-interest to Angus Fire Armour Corp.); RTX CORPORATION (f/k/a United Technologies Corporation); and CARRIER FIRE & SECURITY AMERICAS CORPORATION,

Defendants.

## **COMPLAINT FOR DAMAGES AND JURY DEMAND**

Plaintiff West Prairie Village MHP, LLC ("West Prairie") and Conwin Enterprises LLC ("Conwin") (collectively "Plaintiffs"), by and through counsel, allege as follows:

## **INTRODUCTION**

1. West Prairie owns a manufactured housing community located at 2201 North Craig Road in Spokane, Washington ("the Property"). The Property is located approximately 4.5 miles from Fairchild Air Force Base ("Fairchild").

2. Conwin owns manufactured homes, promissory notes for the purchase of manufactured homes, and security agreements to secure the sale of manufactured

homes located at the Property.

3. Plaintiffs bring this action for injunctive relief, damages and reimbursement of costs incurred, and that continue to be incurred, to address the presence of per- and polyfluoroalkyl substances ("PFAS")—including, but not limited to perfluorooctanoic acid ("PFOA") and perfluooctane sulfonate ("PFOS")—in West Prairie's ground water.

4. PFAS, including PFOA and PFOS, are a group of toxic, extremely persistent, and bioaccumulative synthetic chemicals. When consumed, PFAS can cause serious health impacts.

5. In March 2022, West Prairie entered into a Purchase Agreement to sell the Property for $16 million. However, after discovering the community's groundwater had been contaminated by PFAS that were used at Fairchild, the buyer terminated the Purchase Agreement. West Prairie has not been able to locate another buyer.

6. In March 2022, Conwin entered into a Purchase Agreement to sell promissory note contracts and manufactured homes located at the Property for $1 million. However, after discovering the community's groundwater had been contaminated by PFAS that were used at Fairchild, the buyer terminated the Purchase Agreement. Conwin has not been able to locate another buyer.

7. The buyer was ready, willing, and able to close on the Purchase

Agreements with Plaintiffs but for the groundwater contamination.

8. Defendants 3M Company, AGC, Inc. (f/k/a Asahi Glass Co., Ltd.), AGC Chemicals Americas, Inc., Amerex Corporation, Archroma Management LLC; Archroma U.S., Inc., Arkema, Inc., BASF Corporation, Buckeye Fire Equipment Company, Carrier Global Corporation, ChemDesign Products, Inc., Chemguard, Inc., Chemicals Incorporated, The Chemours Company FC, LLC, The Chemours Company, Chubb Fire, Ltd., Clariant Corporation, Corteva, Inc., Daikin America, Dupont De Nemours, Inc., Deepwater Chemicals, Inc., Dynax Corporation, E.I. du Pont de Nemours & Co., Kidde PLC, Inc., Kidde-Fenwal, Inc., Nation Ford Chemical Company, National Foam, Inc., Tyco Fire Products LP, RTX Corporation (f/k/a United Technologies Corporation), and Carrier Fire & Security Americas Corporation (together, "Defendants"), are responsible for PFAS released into the groundwater surrounding the Property.

9. For years, Defendants manufactured, sold, and/or distributed compounds and products containing PFAS. These products include the firefighting suppressant agent "aqueous film-forming foam" ("AFFF"), which contains PFAS.[1]

10. Defendants manufactured and/or distributed and sold AFFF to the United States without providing any warnings that the chemicals were toxic. The

[1] Unless otherwise noted, all mentions of "AFFF" refer to AFFF containing PFAS and includes the PFAS component parts of AFFF.

United States then released PFAS to the groundwater through its use of AFFF at Fairchild for many decades.

11. Defendants knew that PFAS and related constituents present unreasonable risks to human health, water quality, and the environment. Yet they manufactured, distributed, and sold these chemicals with inadequate warning of their toxic effects. They did so without regard to Plaintiffs' property interests, that would foreseeably be damaged once these chemicals infiltrated the environment.

12. Defendants marketed, distributed, and sold their AFFF with knowledge that it would be used in training exercises, fire control, fire suppression systems, emergency situations, and other ways at United States Air Force ("USAF") bases such at Fairchild.

13. Defendants knew such use would release such PFAS and other contaminants into the environment and failed to warn users of the toxic effects of the chemicals.

14. Defendants' negligent development, manufacturing, distribution, marketing, and sale of AFFF caused contamination of the groundwater surrounding the Property.

15. As a result of Defendants' contamination of the groundwater surrounding the Property, Plaintiffs have and will continue to incur significant losses.

16. Under the common law, Plaintiffs seek injunctive relief requiring Defendants to install or financially compensate Plaintiffs for granulated activated carbon ("GAC") filtration systems and other infrastructure to remediate PFAS on the Property; build wells that draw water from deeper aquifers unaffected by PFAS; and supply the Property's water uses with alternative water supplies unaffected by PFAS.

17. Under federal and state law, Plaintiffs also seek from Defendants compensatory, consequential, and incidental damages; restitution; declaratory judgment; and any additional appropriate relief.

## PARTIES

18. West Prairie is a Washington limited liability company with a principal office located in Spokane, Washington.

19. Conwin is a Washington limited liability company with a principal office located in Spokane, Washington.

20. Defendant The 3M Company ("3M") (f/k/a Minnesota Mining and Manufacturing Co.) is a Delaware corporation. Its principal place of business is at 3M Center, St. Paul, Minnesota 55144-1000.

21. Defendant AGC, Inc. f/k/a Asahi Glass Co., Ltd. ("AGC"), is a corporation organized under the laws of Japan and does business throughout the United States. AGC has its principal place of business at 1-5-1, Marunouchi,

Chiyoda-ku, Tokyo 100-8405 Japan.

22. Defendant AGC Chemicals Americas, Inc. ("AGC America") is a Delaware corporation with its principal business office at 55 E. Uwchlan Avenue, Suite 201, Exton, Pennsylvania 19341. Upon information and belief, AGC America is a subsidiary of AGC, Inc., a Japanese corporation formerly known as Asahi Glass Company, Ltd.

23. Defendant Amerex Corporation ("Amerex") is an Alabama corporation with its principal business office at 2900 Highway 280 S., Ste. 300, Birmingham, AL 35223-2453.

24. Defendant Archroma Management, LLC ("Archroma Management"), is a foreign limited liability company registered in Switzerland, with a principal business address of Neuhofstrasse 11, 4153 Reinach, Basel-Land, Switzerland.

25. Defendant Archroma U.S., Inc. ("Archroma U.S.") is a Delaware corporation with its principal place of business located at 5435 77 Center Dr., #10, Charlotte, North Carolina 28217. Upon information and belief, Archroma U.S., Inc. is a subsidiary of Archroma Management, LLC.

26. Defendant Arkema, Inc. ("Arkema") is a Pennsylvania corporation with its principal place of business at 900 1st Avenue, King of Prussia, Pennsylvania 19406.

27. Defendant BASF Corporation ("BASF") is a Delaware corporation

with its principal place of business at 100 Park Avenue, Florham Park, New Jersey 07932. Upon information and belief, BASF acquired Ciba-Geigy Corporation and/or Ciba Specialty Chemicals.

28. Defendant Buckeye Fire Equipment Company ("Buckeye") is an Ohio corporation with its principal place of business at 110 Kings Road, Kings Mountain, North Carolina 28086.

29. Defendant Carrier Global Corporation ("Carrier") is a Delaware corporation with its principal place of business located at 13995 Pasteur Boulevard, Palm Beach Gardens, Florida 33418. Upon information and belief, Defendant Carrier Fire & Security Americas Corporation is now a division of Carrier.

30. Defendant ChemDesign Products, Inc. ("ChemDesign") is a Texas corporation with its principal place of business located at 2 Stanton Street, Marinette, Wisconsin.

31. Defendant Chemguard, Inc. ("Chemguard") is a Wisconsin corporation with its principal place of business at One Stanton Street, Marinette, Wisconsin 54143-2542.

32. Upon information and belief, Chemguard acquired Williams Fire and Hazard Control, Inc. ("WFHC"). Upon information and belief, WFHC has and continues to sell and/or distribute AFFF throughout the United States.

33. Defendant Chemicals Incorporated ("Chem Inc.") is a Texas

corporation with its principal place of business located at 12321 Hatcherville Road, Baytown, Texas 77521.

34. Defendant The Chemours Company ("Chemours") is a Delaware corporation with its principal place of business at 1007 Market Street, Wilmington, Delaware, 19899. On information and belief, Chemours is a successor-in-interest to DuPont Chemical Solutions Enterprise ("DuPont Chemical"), which was a Delaware Corporation, with a principal place of business located at 1007 Market Street, Wilmington, Delaware 19899.

35. Defendant The Chemours Company FC, LLC ("Chemours FC"), successor-in-interest to DuPont Chemical Solutions Enterprise, is a Delaware limited liability company with its principal place of business located at 1007 Market Street Wilmington, Delaware, 19899.

36. Defendant Chubb Fire, Ltd. ("Chubb") is a foreign private limited company with its principal place of business at Littleton Road, Ashford, Middlesex, United Kingdom TW15 1TZ. On information and belief, Chubb is registered in England with a registered number of 134210. On information and belief, Chubb is or has been composed of different subsidiaries and/or divisions, including but not limited to, Chubb Fire & Security Ltd.; Chubb Security, PLC; Red Hawk Fire & Security, LLC; and/or Chubb National Foam, Inc. Chubb is part of UTC Climate, Controls, & Security, a unit of RTX Corporation (f/k/a United Technologies

Corporation) (“RTX”).

37. Defendant Clariant Corporation (“Clariant”) is a New York corporation with its principal place of business located at 4000 Monroe Road, Charlotte, North Carolina 28205.

38. Defendant Corteva, Inc. (“Corteva”) is a Delaware corporation with its principal place of business located at 974 Centre Road, Building 735, Wilmington, Delaware 19805. Upon information and belief, Corteva, Inc. is one of the aforementioned spin-off companies from DowDuPont, Inc., and is believed to have assumed some of the PFAS liabilities of the former DuPont.

39. Defendant Daikin America (“Daikin”) is a Delaware corporation with its principal place of business located at 20 Olympic Drive, Orangeburg, New York 10962.

40. Defendant Deepwater Chemicals, Inc. (“Deepwater”) is a Delaware corporation with its principal place of business located at 196122 E County Road 40, Woodward, Oklahoma 73801.

41. Defendant DuPont de Nemours, Inc. (“New DuPont”) is a Delaware corporation with its principal place of business located at 974 Centre Road, Building 730, Wilmington, Delaware 19805. Upon information and belief, DowDuPont, Inc. was formed in 2017 as a result of the merger of Dow Chemical and DuPont. DowDuPont, Inc. was subsequently divided into three publicly traded

companies and on June 1, 2019, DowDuPont, Inc. changed its registered name to DuPont de Nemours, Inc.

42. Defendant Dynax Corporation ("Dynax") is a Delaware corporation with its principal place of business located at 79 Westchester Avenue, Pound Ridge, New York 10576.

43. Defendant E.I. du Pont de Nemours & Co. ("DuPont") is a Delaware corporation with its principal place of business at 974 Centre Road Wilmington, Delaware 19805. On information and belief, Chemours is a successor-in-interest to DuPont Chemical.

44. In 2015, DuPont spun off its "Performance Chemicals" business to Chemours, along with certain environmental liabilities. Upon information and belief, at the time of the transfer of its Performance Chemicals business to Chemours, DuPont had been sued, threatened with suit and/or had knowledge of the likelihood of litigation to be filed regarding DuPont's liability for damages and injuries arising from the manufacture and sale of fluorosurfactants and the products that contain fluorosurfactants.

45. Defendant Kidde PLC, Inc. ("Kidde") is a Delaware corporation with its principal place of business at One Carrier Place, Farmington, Connecticut 06034. On information and belief, Kidde was formerly known as Williams Holdings, Inc. and/or Williams US, Inc.

46. Defendant Kidde-Fenwal, Inc. ("Kidde-Fenwal") is a Delaware corporation with its principal place of business located at 400 Main Street, Ashland, Massachusetts 01721. On information and belief, Kidde-Fenwal is the successor-in-interest to Kidde Fire Fighting, Inc. and is part of UTC Climate, Controls, & Security, a unit of RTX.

47. Defendant Nation Ford Chemical Company ("Nation Ford") is a South Carolina corporation with its headquarters located at 2300 Banks Street, Fort Mill, South Carolina 29715.

48. Defendant National Foam, Inc. ("National Foam") is a Delaware corporation with its principal place of business at 141 Junny Road, Angier, North Carolina 27501. On information and belief, National Foam is the successor-in-interest to Angus Fire Armour Corporation. National Foam is a subsidiary of Angus International Safety Group, Ltd. Upon information and belief, National Foam manufactures the Angus brand of AFFF products.

49. Defendant Tyco Fire Products LP ("Tyco") is a Delaware limited partnership with its principal place of business at 1400 Pennbrook Parkway, Lansdale, Pennsylvania 19446. On information and belief, Tyco is the successor-in-interest to Ansul, Inc. ("Ansul"). On information and belief, Tyco's governing partners are citizens of Florida, Pennsylvania, and Delaware. Tyco acquired Chemguard in 2011.

50. Defendant RTX is a Delaware corporation with its principal place of business at 1000 Wilson Boulevard, Arlington, Virginia 22209.

51. Defendant Carrier Fire & Security Americas Corporation ("Carrier Fire & Security") is a Delaware corporation with its principal place of business at 13995 Pasteur Blvd., Palm Beach Gardens, Florida 33418-7231. On information and belief, Carrier Fire & Security was formerly known as UTC Fire & Security Americas Corp., Inc., GE Interlogix, Inc., and GE Security Inc.

## JURISDICTION AND VENUE

52. This Court has jurisdiction to hear Plaintiffs' claims against the Defendants pursuant to 28 U.S.C. § 1332, as the parties are completely diverse and the amount in controversy exceeds $75,000.

53. This Court also has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

54. In addition, the Declaratory Judgments Act, 28 U.S.C. § 2201, authorizes this Court to grant declaratory relief in this matter.

55. Venue properly lies in the Eastern District of Washington pursuant to 28 U.S.C. 1391, because a substantial part of the events giving rise to rise to this Complaint occurred in that district.

## FACTUAL ALLEGATIONS

### *PFAS Pose a Threat to Human Health and the Environment.*

56. PFAS are a family of synthetic chemicals containing fluorine and carbon atoms. As used in this Complaint, the term "PFAS" includes all PFAS that have been or may be detected in the Property's water supplies, including, inter alia, PFOA, PFOS, perfluorononanoic acid ("PFNA"), perflourohexane sulfonic acid ("PFHxS"), and perflurobutanesulfonic acid ("PFBS").

57. PFAS have strong surfactant properties, meaning they reduce the surface tension between a liquid and another liquid or solid. For this reason, they are effective in products requiring fire resistance or oil, stain, grease, and water repellency.

58. PFAS are in many products, including, but not limited to, firefighting foams, wire insulation, cleaners, textiles, leather, paper, and paints.

59. PFAS are not naturally occurring. Thus, PFAS detected in the environment and in humans are attributable to human activity. Hundreds of PFAS have been manufactured, distributed, and sold in the United States.

60. The two most widely known and studied PFAS are PFOA and PFOS.

61. Due to their chemical structure, PFAS do not normally hydrolyze, photolyze, or biodegrade under environmental conditions, and are extremely persistent in the environment and in human tissue.

62. PFAS also are particularly mobile in soil and water, are readily absorbed into groundwater, and can migrate across long distances.

63. Studies have shown that PFAS bioaccumulate in humans and wildlife.

64. Specifically, humans may absorb PFAS from drinking water. PFAS accumulate primarily in the bloodstream, kidneys, and liver.

65. In 2009, EPA issued Provisional Health Advisories ("Provisional Health Advisories") "to assess potential risk from exposure to [PFOS and PFOA] through drinking water," setting provisional lifetime health advisory levels of 400 parts per trillion ("ppt") for PFOA ("Provisional Levels") and 200 ppt for PFOS. No sampling was required until 2012.

66. In May 2016, EPA issued Health Advisories for PFOA and PFOS ("Health Advisories") at even lower levels, warning that drinking water containing PFAS above a combined value of 70 ppt for PFOA and PFOS poses risks of adverse human health effects. EPA announced the Health Advisories on May 19, 2016, and published them in the Federal Register on May 25, 2016.

67. Studies completed in 2015 on PFAS by the Agency for Toxic Substances and Disease Registry ("ATSDR"), the U.S. Public Health Service, and the U.S. Department of Health and Human Services also show that PFAS, including PFOA and PFOS, may adversely affect human health and the environment.

68. For example: on June 20, 2018, the ATSDR and the U.S. Department

of Health and Human Services released a draft toxicological profile for perfluoroalkyls for public comment ("2018 ATSDR Toxics Profile").

69. The 2018 ATSDR Toxics Profile was prepared pursuant to CERCLA § 104(i), 42 U.S.C. § 9604(i), and characterizes the toxicological and adverse health effects for 14 PFAS. In the Profile, ATSDR set provisional minimal risk levels for the PFAS analyzed. It concluded that several have long half-lives in humans, and that PFAS exposure can cause several adverse health outcomes.

70. The 2018 ATSDR Toxics Profile explains that "EPA (2016e, 2016f) has concluded that there is suggestive evidence of the carcinogenic potential of PFOA and PFOS in humans. [The International Agency for Research on Cancer] . . . (2017) concluded that PFOA is possibly carcinogenic to humans (Group 2B)."

71. Additionally, nonhuman receptors exposed to the contaminated environment are at significant risk of harm. PFOA is persistent and can cause adverse effects in laboratory animals, including cancer and developmental and systemic toxicity. PFOS is persistent, bioaccumulative, and toxic to mammalian species. PFOS is linked to developmental, reproductive, and systemic toxicity. PFOA and PFOS are also linked to immune system impacts on certain animal species.

72. PFOA is also readily taken up by plants, including wild plants and crops that are grown on contaminated soil, and lead to further bioaccumulation in

the food chain.

***Since the 1960s AFFF has Been Used and Released Into the Environment, Including at Fairchild.***

73. In or about 1966, the United States patented AFFF as a method for extinguishing liquid hydrocarbon fires and other fires at military bases, airports, oil refineries, and firefighting training facilities, including Fairchild.

74. In 1969, the Department of Defense ("DOD") issued military specification MIL-F-24385 (amended subsequently), requiring AFFF liquid concentrate to contain either 3% or 6% PFAS. In MIL-F-24385, DOD refers to 3% AFFF concentrate as "Type 3" and to 6% AFFF concentrate as "Type 6."

75. In the foam industry, concentrates are typically referred to as "3%" or "6%" concentrate, depending on the mixture rate with water (either 97% or 94%, respectively). AFFF concentrates contain about 60–90% water and have a fluorine content of about 0.3–1.8%.

76. AFFF and other Class B fluorine-containing firefighting foams have been stored and used for fire suppression of flammable liquid fires, fire training, and flammable vapor suppression at military installations and civilian airports in the United States, including Fairchild.

77. AFFF concentrate containing PFAS is stored in aboveground storage tanks, underground storage tanks, and nonstationary containers. To use AFFF

stored in this manner, the concentrate is mixed with water to make a liquid foam solution. The foam solution is then aerated at the nozzle, yielding finished foam that is then ready to be applied to a fire.

78. AFFF is designed to coat the fire, blocking its oxygen supply and creating a barrier to extinguish vapors. AFFF also forms a film to smother the fire after the foam has dissipated.

79. Thousands of gallons of foam solution may be applied during a single AFFF release or discharge.

80. AFFF has been released into the environment, including at Fairchild, through a variety of practices and mechanisms including:

- Low-volume releases of foam concentrate during storage transfer, or equipment calibration;
- Moderate-volume discharge of foam solution for apparatus testing;
- High-volume, broadcast discharge of foam solution for fire training, fighting, suppression and prevention; and
- Leaks from foam distribution piping between storage and pumping locations.

81. Safety Data Sheets ("SDSs") (f/k/a Material Safety Data Sheets ("MSDSs")) require that, after AFFF foam is released, spilled, discharged, or disposed into the environment, it must be contained so it does not accumulate in sediment, soil, surface water sewers, or groundwater.

82. If it is not contained, AFFF reverts from foam to the liquid solution of PFAS and water, and accumulates in sediment, soil, surface water and/or sewers, and groundwater.

***Defendants Supplied AFFF to the Department of Defense, Which the Supplied it to Fairchild.***

83. On information and belief, since the 1960s, Defendants coordinated with DOD to develop AFFF meeting MIL-F-24385 specifications to extinguish fires at military bases, airports, oil refineries, and firefighting training facilities throughout the United States, including Fairchild.

84. On information and belief, Defendant 3M does business throughout the United States, including in Washington. It developed, designed, manufactured, marketed, sold, and distributed AFFF from approximately 1964 through at least 2002. The Air Force purchased 3M's AFFF and used it for fire training and response at military bases and other locations throughout the country, including Fairchild.

85. On information and belief, between 2000 and 2002, Defendant 3M voluntarily phased out its production of some but not all PFAS and sold AFFF containing PFOS until approximately 2003.

86. On information and belief, Defendant AGC does business throughout the United States, including in Washington. AGC designed, manufactured,

marketed, and sold AFFF that was used on military facilities and bases throughout the United States, including Fairchild.

87. On information and belief, Defendant AGC America does business throughout the United States, including in Washington. AGC America designed, manufactured, marketed, and sold AFFF that was used on military facilities and bases throughout the United States, including Fairchild.

88. On information and belief, Defendant Amerex does business throughout the United States, including in Washington. Amerex designed, manufactured, marketed, and sold AFFF that was used on military facilities and bases throughout the United States, including Fairchild.

89. On information and belief, Defendant Archroma Management does business throughout the United States, including in Washington. Archroma Management designed, manufactured, marketed, and sold AFFF that was used on military facilities and bases throughout the United States, including Fairchild.

90. On information and belief, Defendant Arkema does business throughout the United States and registered to do business in Washington. Arkema designed, manufactured, marketed, and sold AFFF that was used on military facilities and bases throughout the United States, including Fairchild.

91. On information and belief, Defendant BASF does business throughout the United States and is registered to do business in Washington. BASF designed,

manufactured, marketed, and sold AFFF that was used on military facilities and bases throughout the United States, including Fairchild.

92. On information and belief, Defendant National Foam does business throughout the United States, including in Washington. It developed, designed, manufactured, marketed, sold, and distributed AFFF to military facilities and bases throughout the United States, including Fairchild, from approximately 1973 through the present.

93. On information and belief, Defendant Buckeye does business throughout the United States, including in Washington. From approximately 2003 through the present, Buckeye designed, manufactured, marketed, and sold AFFF to military facilities and bases throughout the United States, including Fairchild.

94. On information and belief, Defendant ChemDesign does business throughout the United States, including in Washington. ChemDesign designed, manufactured, marketed, and sold AFFF that was used on military facilities and bases throughout the United States, including Fairchild.

95. On information and belief, Defendant Chemguard does business throughout the United States, including in Washington. It designed, manufactured, marketed, and sold PFAS- containing AFFF to military facilities and bases throughout the United States, including Fairchild, from approximately 1997 on.

96. On information and belief, Defendant Chemours does business

throughout the United States, and is registered to do business in Washington. It designed, manufactured, marketed, sold, and distributed AFFF to military facilities and bases throughout the United States, including Fairchild, for decades.

97. On information and belief, Defendant Chemours FC does business throughout the United States and registered to do business in Washington. Chemours FC designed, manufactured, marketed, and sold AFFF that was used on military facilities and bases throughout the United States, including Fairchild.

98. On information and belief, throughout the 1990s, through its association with National Foam, Defendant Chubb obtained patents (under the name Chubb National Foam, Inc.) for AFFF and similar firefighting foams, including Patent No. 5207932, dated May 4, 1993, for alcohol-resistant AFFF.

99. On information and belief, Defendant Chubb does business throughout the United States, including in Washington. Chubb, through its association with National Foam, designed, manufactured, marketed, and sold AFFF to military facilities and bases throughout the United States, including Fairchild, during the early 2000s under the name Chubb National Foam, Inc.

100. On information and belief, Defendant Chem Inc. does business throughout the United States, including in Washington. Chem Inc. designed, manufactured, marketed, and sold AFFF that was used on military facilities and bases throughout the United States, including Fairchild.

101. On information and belief, Defendant Clariant does business throughout the United States and is registered to do business in Washington. Clariant designed, manufactured, marketed, and sold AFFF that was used on military facilities and bases throughout the United States, including Fairchild.

102. On information and belief, Defendant Corteva does business throughout the United States and registered to do business in Washington. Corteva designed, manufactured, marketed, and sold AFFF that was used on military facilities and bases throughout the United States, including Fairchild.

103. On information and belief, Defendant Daikin does business throughout the United States, including in Washington. Daikin designed, manufactured, marketed, and sold AFFF that was used on military facilities and bases throughout the United States, including Fairchild.

104. On information and belief, Defendant Deepwater does business throughout the United States, including in Washington. Deepwater designed, manufactured, marketed, and sold AFFF that was used on military facilities and bases throughout the United States, including Fairchild.

105. On information and belief, Defendant DuPont does business throughout the United States, and is registered to do business in Washington. DuPont designed, manufactured, marketed, and sold AFFF that was used on military facilities and bases throughout the United States, including Fairchild.

106. On information and belief, Defendant New DuPont does business throughout the United States, including in Washington. New DuPont designed, manufactured, marketed, and sold AFFF that was used on military facilities and bases throughout the United States, including Fairchild.

107. On information and belief, Defendant Dynax does business throughout the United States, including in Washington. Dynax designed, manufactured, marketed, and sold AFFF that was used on military facilities and bases throughout the United States, including Fairchild.

108. On information and belief, Defendant Kidde does business throughout the United States, including in Washington. It developed, designed, manufactured, marketed, sold, and distributed AFFF to military facilities and bases throughout the United States, including Fairchild, from approximately 2000 through 2013.

109. On information and belief, Defendant Kidde-Fenwal does business throughout the United States, including in Washington. It designed, manufactured, marketed, and sold AFFF to military facilities and bases throughout the United States, including Fairchild, from approximately 1991 through the present.

110. On information and belief, Defendant Nation Ford does business throughout the United States, including in Washington. Nation Ford designed, manufactured, marketed, and sold AFFF that was used on military facilities and bases throughout the United States, including Fairchild.

111. On information and belief, Defendants Tyco (and its predecessor Ansul) does business throughout the United States, including in Washington. Tyco, Ansul and National Foam developed, designed, manufactured, marketed, sold, and distributed AFFF to military facilities and bases throughout the United States, including Fairchild, from approximately 1974 through the present.

112. On information and belief, Defendant RTX does business throughout the United States, including in Washington. It developed, designed, manufactured, marketed, sold, and distributed AFFF to military facilities and bases throughout the United States, including Fairchild, from approximately 2003 to 2013.

113. On information and belief, Defendant Carrier Fire & Security does business throughout the United States, including in Washington. It designed, manufactured, marketed, and sold AFFF to military facilities and bases throughout the United States, including Fairchild.

114. On information and belief, Defendants developed, manufactured, marketed, distributed, and/or sold AFFF to the Air Force and the Army at various times throughout the relevant operative period (e.g., approximately 1960 through 2016). During this period, the Air Force and the Army distributed AFFF to military bases and facilities, including Fairchild.

115. On information and belief, some Defendants continue to develop, design, manufacture, market, sell, and distribute AFFF.

***Defendants Knew and Failed to Warn that AFFF was Toxic.***

116. On information and belief, by at least the 1970s, Defendants knew of the risks of PFAS, including AFFF, to the environment and human health and failed to warn users of those risks.

117. As documented by a research arm of the U.S. Navy in a Naval Ocean Systems Center ("NOSC") study, the military was aware of toxicity studies showing harmful PFAS effects to a variety of organisms dating back to at least 1973.

118. In addition to reviewing nonmilitary studies, U.S. military investigators conducted their own studies. For instance, in 1973, the Air Force conducted a study to assess AFFF's toxicity effects on fish in controlled laboratory experiments. One AFFF formulation tested, FC-200 Light Water, was manufactured by 3M and was on the Qualified Products List for AFFF meeting military specification MIL-F-24385.

119. A 1985 literature survey by NOSC concluded that "usage of AFFF and the disposal of AFFF-laden wastewater have the potential for an adverse impact on the environment -- these foams are potentially toxic due to the fluorocarbons and surfactants." NOSC references toxicity studies showing impacts on a variety of organisms in the 1970s and 1980s. It also analyzes several studies conducted by 3M in 1980 showing AFFF's lethality at various concentrations across a 96-hour

timeframe. NOSC concludes these "earlier studies demonstrated that a wide range of toxic concentrations exist for a variety of organisms."

120. 3M knew as early as the 1950s that PFAS bioaccumulates in humans and animals and did not provide warnings of the bioaccumulation.

121. A 1956 study at Stanford University concluded that the PFAS manufactured by 3M binds to proteins in blood.

122. By the early 1960s, 3M also understood that PFAS are stable, persist in the environment, and do not degrade.

123. In 1970, the authors of a scientific journal article conducted tests on a 3M product that contained PFAS and observed that it was "highly derogatory to marine life"; "the entire test program had to be abandoned to avoid severe local stream pollution."

124. Studies undertaken by 3M in the 1970s demonstrated that PFAS were even "more toxic than was previously believed."

125. In 1975 3M Scientist Richard Newmark authored an internal 3M report stating that the fluorine compound found in blood bank samplings "resembled most closely" PFOS.

126. A 1978 study by 3M on PFOA and PFOS specifically confirmed that "these chemicals are likely to persist in the environment for extended periods unaltered by microbial catabolism."

127. In 1979, a 3M scientist recognized that PFAS posed a cancer risk because they are "known to persist for a long time in the body and thereby give long-term chronic exposure."

128. In the 1970s, 3M began a major program to review personnel handling of fluorochemicals. 3M's monitoring confirmed that fluorochemicals could bioaccumulate.

129. The potential loss of profits drove 3M to engage in a deliberate campaign to influence the science relating to PFAS and, according to internal company documents, to conduct scientific "research" that it could use to mount "defensive barriers to litigation."

130. A key priority of an internal 3M committee was to "[c]ommand the science" concerning the "exposure, analytical, fate, effects, human health and ecological" risks posed by PFAS and for 3M to provide "[s]elective funding of outside research through 3M 'grant' money."

131. In exchange for providing grant money to researchers, 3M obtained the right to review and edit drafts of papers on PFAS and sought control over when and whether these papers were published at all.

132. Under pressure from EPA, on May 16, 2000, 3M announced it would phase out production of two synthetic chemicals, PFOS and PFOA, which it had developed more than 50 years earlier. On information and belief, 3M ceased

production of PFOS-based AFFF in 2002.

133. An EPA internal memo on the day of 3M's phase-out announcement stated: "3M data supplied to EPA indicated that these chemicals are very persistent in the environment, have a strong tendency to accumulate in human and animal tissues and could potentially pose a risk to human health and the environment over the long term. [PFOS] appears to combine Persistence, Bioaccumulation, and Toxicity properties to an extraordinary degree."

134. In contrast, 3M stated in its news release on the same event that "our products are safe," while extolling their "principles of responsible environmental management" as driving the decision to cease their production.

135. Defendants had a duty, which they breached, to notify the EPA when they had reason to believe that a substance or mixture—such as PFAS—presented a substantial risk of injury to health or the environment.

136. Prior to about 1983, no containment measures were listed in MSDSs, nor were the dangers to health or the environment inherent in AFFF disclosed in the instructions, warning labels, or product packaging for AFFF. In other words, Defendants failed to provide any warnings of the toxic effect of the chemicals in AFFF.

137. By about 1983, MSDSs for certain AFFF products directed users to collect AFFF before discharging to a wastewater treatment system and/or to contain

liquid materials containing PFAS to prevent spilled material from reaching sewers or waterways.

138. By 2010, SDSs for certain AFFF products directed users to contain accidental releases by stopping the flow of the material, utilizing a dike for the spilled material, and preventing entry into waterways, sewers, basements, or confined spaces. For large spill releases, SDS procedures required diking the spill for later disposal; use of noncombustible materials such as vermiculite, sand, or earth to soak up the product; and containerizing the product for later disposal.

139. By 2010, following product recovery, SDS procedures for certain AFFF products required flushing the area with water and cleaning the surface thoroughly to remove residual contamination. MSDSs for some AFFF products provided instructions for users not to release AFFF to local wastewater treatment plant without permission.

140. Between about 1983 and the present, the MSDSs and SDSs, instructions, warning labels, and product packaging did not fully describe or adequately warn users of AFFF health and environmental risks, or of all precautions they should take—risks and precautions that Defendants knew or should have known existed.

141. On information and belief, existing stocks of PFOA and PFOS may still be used, and PFOA and PFOS may be contained in some imported articles, at

Fairchild.

142. In the 1970s, Defendants began making AFFF that included shorter carbon chain PFAS. On information and belief, those other PFAS also are highly soluble, persistent, bioaccumulative, and toxic to humans.

143. On information and belief, some or all of the Defendants continue to develop, manufacture, and/or sell AFFF containing other PFAS compounds with six carbon atoms ("Short Chain PFAS"), rather than eight carbon atoms ("Long Chain PFAS," like PFOS and PFOA).

144. On information and belief, Short Chain PFAS also accumulate in blood and other tissues and will persist indefinitely in the environment, posing threats to the environment and health.

145. On information and belief, Short Chain PFAS are harder to remove from the environment than Long Chain PFAS and can break through carbon filtration systems more easily.

146. On information and belief, there are at least 24 firefighting foam products currently on the market that do not contain PFAS, including products manufactured by Angus Fire Ltd., Auxquimia, S.A.U., Dafo Fomtec AB, and The Solberg Company, which are economically and technologically feasible.

***Fairchild's use of AFFF.***

147. For decades, Fairchild has been home to both operational and

historical firefighting training sites operated by or permitted by the USAF.

148. Since the 1970s, Fairchild has conducted or has permitted numerous firefighting training exercises relying heavily on AFFF that was obtained from Defendants.

149. The widespread use of AFFF at Fairchild caused PFOA and PFOS to seep into the surrounding soil and groundwater.

150. Eventually PFOA and PFOS contaminated numerous private and public wells relied upon by communities like West Prairie.

151. Investigations confirm that Fairchild's decades of use, storage, and disposal of AFFF caused widespread contamination of PFOA and PFOS levels, exceeding safe limits in both municipal and private water sources.

152. Multiple studies and assessments all confirmed the existence of widespread PFC contamination of the groundwater resources for the area surrounding Fairchild ("Areas of Investigation"). These studies were conducted by HydroGeoLogic, Inc., CH2M Hill, the USAF, the EPA, Office of Water, Amec Foster Wheeler, and the Washington State Department of Ecology ("WSDE").

153. The USAF and WSDE have also concluded that decades of use, storage, and disposal of AFFF at Fairchild caused the PFOA and PFOS contamination of groundwater in the surrounding communities, including contaminating the municipal water system and private wells serving communities

that surround Fairchild.

***West Prairie and Conwin's Loss of Sales Due to PFAS Contamination.***

154. West Prairie owns a manufactured housing community, the Property, and rents lots to its residents who own a manufactured home that they live on the lot.

155. Conwin owns promissory note contracts and manufactured homes located at the Property.

156. The Property is approximately 4.5 miles northeast from Fairchild.

157. Fairchild's continued and constant use of AFFF contaminated the groundwater serving the USAF Base and surrounding neighborhoods, including the Property.

158. On March 2, 2022, West Prairie and Conwin entered into Purchase Agreements with Goldside Capital, LLC ("Goldside") that Goldside agreed to purchase the Property for $16 million and purchase Conwin's contractual and ownership interests in manufactured homes located at the Property for $1 million.

159. Goldside subsequently commissioned AEI Consultants ("AEI") to conduct a Phase 1 Environmental Site Assessment for the Property (the "ESA").

160. On April 12, 2022, AEI issued its ESA. AEI determined that the Property is located within the Fairchild PFOA/PFOS Drinking Water Well Monitoring Area. Testing results from Fairchild in May 2021 found PFOS on the

Property at a concentration of 15.4 parts per trillion ("ppt") and PFOA at 9.8 ppt.

161. On April 14, 2022, Goldside terminated the Purchase Agreements with West Prairie and Conwin because Fairchild negligently contaminated the groundwater at the Property.

162. Under EPA's National Primary Drinking Water regulations, the Maximum Contaminant Level ("MCL") for PFOS and PFOA is 4 ppt.

163. The USAF conducted additional sampling on the property on May 31, 2023. The drinking water samples results were 11 ppt for PFOA and 10 ppt for PFOS at one sampling location, and 6.0 ppt PFOA and 8.1 ppt PFOS at a second location.

164. As a result of the groundwater contamination at the Property, Plaintiffs reasonably anticipate that the market value of the Property will be significantly impacted, and that the Property will be unusable for the purposes that Plaintiffs purchased it, constructed homes on it, and that it is zoned. Plaintiffs will further bear ongoing carrying costs on the Property while they seek to find a new buyer (if one can be found) that is interested in buying the Property in its current condition.

## CLAIMS FOR DAMAGES

### First Cause of Action - Negligence

165. Plaintiffs incorporate by reference the allegations contained in the

preceding paragraphs of this Complaint as if fully set forth herein.

166. Defendants had a duty to manufacture and/or market, distribute, and sell their AFFF in a manner that avoided contamination of the environment, including municipal water supplies, and avoided harm to those who would foreseeably come into contact with its chemical components.

167. Defendants knew or should have known that the manufacture of AFFF was hazardous to human health and the environment.

168. Defendants further knew or should have known that it was unsafe and/or unreasonably dangerous to manufacture AFFF using PFAS because it was highly probable that the chemicals would migrate into the environment, including the environment at military installations such as Fairchild, and contaminate groundwater.

169. Knowing of the dangerous and hazardous properties of AFFF, Defendants had the duty to warn of the hazards of consuming water containing PFAS.

170. Plaintiffs were foreseeable victims of the harm caused by the chemical components of Defendants' AFFF.

171. Defendants negligently designed, engineered, developed, fabricated, and tested AFFF and PFAS, negligently manufactured, and/or distributed and sold AFFF, and negligently created the associated warnings and instructions.

172. Defendants thereby failed to exercise reasonable care to prevent AFFF and its components from presenting an unreasonable risk to the health of persons who would come in contact with them. Defendants also failed to exercise reasonable care to prevent contamination of public and agricultural water supplies, including the Property's groundwater.

173. Defendants' negligent design, engineering, development, fabrication, testing, warnings, and instructions constitute a pattern of continuous and ongoing tortious conduct.

174. On information and belief, Defendants have engaged and continue to engage in discrete acts of negligent design, engineering, development, fabrication, testing, warnings, and instructions.

175. On information and belief, Defendants have not recalled their AFFF products.

176. Defendants' breaches of their legal duties have caused PFAS to contaminate the groundwater beneath and around Fairchild, including groundwater in the Aquifers near the Property.

177. Defendants' have caused, and will continue to cause, damage to the Property's value due to their negligent manufacture and/or distribution and sale of AFFF, and their negligent misrepresentation and failure to warn causing PFAS to contaminate the Property's water supply.

178. Defendants' negligent, reckless and/or intentional acts and omissions alleged herein contaminated the groundwater with PFAS.

179. Defendants' acts were willful, wanton, or reckless and conducted with a reckless indifference to the rights and property of the Plaintiffs.

180. Defendants' conduct, and the resulting contamination of groundwater by the chemical components of the Defendants' AFFF, caused the Plaintiffs to incur significant losses.

181. As a direct and proximate result of Defendant's negligence, West Prairie suffered from the loss of sale of the Property, from diminution of the Property's value, and from ongoing carrying costs on the Property, in an amount of at least $16 million.

182. As a direct and proximate result of Defendant's negligence, Conwin has suffered from the loss of sale under the Purchase Agreement, from diminution of the Property's value, and from ongoing carrying costs on the Property, in the amount of $1 million.

**Second Cause of Action – Failure to Warn**

183. Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

184. This cause of action is brought pursuant to Washington State statutory law to include but not limited to Chapter 7.72 RCW.

185. Under Washington State law, "a product manufacturer is subject to liability…if the claimant's harm was proximately caused by the negligence of the manufacturer in that the product was not reasonably safe as designed or not reasonably safe because adequate warnings or instructions were not provided." RCW 7.72.030(1).

186. Although RCW 7.72.030(1) expresses a negligence liability standard, the Washington State Supreme Court has held that "[t]he adequacy of a manufacturer's warnings are to be measured under Washington's strict liability test. *Taylor v. Intuitive Surgical, Inc.*, 389 P.3d 517, 528 (Wash. 2017) (applying strict liability standard established in Restatement (Second) of Torts § 402A (Am. Law Inst. 1965) to failure to warn claim).

187. A product is not reasonably safe due to inadequate warnings or instructions if "at the time of manufacture, the likelihood that the product would cause the claimant's harm or similar harms, and the seriousness of those harms, rendered the warnings or instructions of the manufacturer inadequate and the manufacturer could have provided the warnings or instructions that the claimant alleges would have been adequate." RCW 7.72.030(1)(b).

188. Where a manufacturer learned, or where a reasonably prudent manufacturer should have learned, about a danger connected with the product after it was manufactured, and did not then provide adequate warnings or instructions,

the product is not reasonably safe. RCW 7.72.030(1)(c).

189. In such a case, the manufacturer is under a duty to issue warnings or instructions in the manner of a reasonably prudent manufacturer in the same or similar circumstances. This duty is satisfied if the manufacturer exercises reasonable care to inform product users. *Id*.

190. At all times relevant, Defendants were in the business of, among other things, manufacturing and/or selling and distributing AFFF.

191. As manufacturers and/or sellers and distributors of a commercial product, the Defendants had a duty to provide adequate, full instructions, and warnings about the risks of injury posed by their products.

192. Considering the factors related to risk, foreseeability, social utility, the burden of guarding against the harm, and the practical consequences of placing that burden on the Defendants, the Defendants owed a cognizable duty to the Plaintiffs not to contaminate the Property's groundwater, as well as the environment and groundwater in and around Fairchild, with AFFF containing dangerous levels of PFAS.

193. The storage, use, release, and disposal of Defendants' AFFF at military installations, including Fairchild, were foreseeable. Defendants knew or should have known the likelihood that PFAS from AFFF would enter the groundwater and household water supplies, persist there for decades, cause risks to human health and

the environment, and harm property.

194. At the time of the design, manufacture and/or distribution and sale of the AFFF, Defendants knew or should have known of the dangerous properties of their AFFF.

195. On information and belief, the Defendants at significant times failed to provide sufficient instructions and warnings to the users of AFFF, including Fairchild. As a result, users were unaware that use and release of Defendants' AFFF to the environment would contaminate groundwater.

196. On information and belief, the Defendants failed to provide adequate instructions and warnings to users that AFFF contamination of the groundwater and soil would pose dangers to human health and the environment at significant times.

197. Defendants' failure to provide adequate instructions and warnings constitutes a pattern of continuous and ongoing tortious conduct.

198. On information and belief, Defendants failed and continue to fail to provide adequate instructions and warnings, and have not recalled their AFFF products.

199. Adequate instructions and warnings would have reduced or avoided the foreseeable risks of harm posed by the use and release AFFF.

200. Had Defendants provided adequate warnings, Fairchild would not have used AFFF or would have taken measures to store, use, discharge, and dispose of

AFFF to reduce or eliminate groundwater and soil contamination.

201. Defendants' failure to warn against the likelihood of contamination from their AFFF caused its chemical components, including PFAS, to contaminate the groundwater below the Property.

202. Defendants' failure to warn of the environmental and health impacts caused by releasing their AFFF and its chemical components of their AFFF directly and proximately caused PFAS to contaminate the groundwater below the Property causing Plaintiffs' significant losses.

203. Defendants' failure to provide adequate warnings or instructions renders Defendants' AFFF a defective product.

204. Defendants' conduct, and the resulting contamination of the groundwater by the Defendants' AFFF, caused the Plaintiffs to incur significant losses.

205. West Prairie losses include the loss of sale of the Property, from diminution of the Property's value, and from ongoing carrying costs on the Property, in an amount of at least $16 million.

206. Conwin's losses include the loss of sale under the Purchase Agreement, from diminution of the Property's value, and from ongoing carrying costs on the Property, in the amount of $1 million.

**Third Cause of Action – Defective Product - Design Defect**

207. Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

208. This cause of action is brought pursuant to Washington State statutory law, including but not limited to, Chapter 7.72 RCW.

209. Under Washington law, "a product manufacturer is subject to liability…if the claimant's harm was proximately caused by the negligence of the manufacturer in that the product was not reasonably safe as designed or not reasonably safe because adequate warnings or instructions were not provided." RCW 7.72.030(1).

210. "A product is not reasonably safe as designed, if, at the time of manufacture, the likelihood that the product would cause the claimant's harm or similar harms, and the seriousness of those harms, outweighed the burden on the manufacturer to design a product that would have prevented those harms, and the adverse effect that an alternative design that was practical and feasible would have on the usefulness of the product." RCW 7.72.030(1)(a).

211. At all times relevant, Defendants were in the business of, among other things, manufacturing, selling, and/or distributing AFFF.

212. It was foreseeable that toxic chemicals from the AFFF that Defendants manufactured and/or sold and distributed would enter the groundwater near the

Property and cause damage to its property interests.

213. Alternative designs and formulations of AFFF were available, technologically feasible and practical, and would have reduced or prevented the reasonably foreseeable risks of harm to the Property.

214. Further, design, formulation, manufacture, and/or distribution and sale of a product containing chemicals that were so toxic, mobile, and persistent in the environment was unreasonably dangerous.

215. The AFFF manufactured and/or distributed and sold by Defendants was defective in design because the foreseeable risk of harm posed by the AFFF could have been reduced or eliminated by the adoption of a reasonable alternative design, and because it was unreasonably dangerous.

216. Defendants' products were defective at the time of manufacture and/or distribution and sale, and thus at the time they left Defendants' control.

217. Defendants' sale and distribution of AFFF constitutes a pattern of continuous and ongoing tortious conduct.

218. On information and belief, Defendants have sold and distributed, and continue to sell and distribute, AFFF in a tortious manner.

219. On information and belief, Defendants have not recalled their AFFF product.

220. Defendants' manufacture and/or distribution and sale of a defectively

designed product caused PFAS to contaminate the groundwater and to damage the Property.

221. Defendants' design, formulation, manufacture and/or distribution and sale of a defective product renders Defendants strictly liable in damages to Plaintiffs.

222. Defendants' acts were willful, wanton, or reckless and conducted with a reckless indifference to the rights of the Plaintiffs.

223. Defendants' conduct, and the resulting contamination of the groundwater by the chemical components of the Defendants' AFFF, caused Plaintiffs to incur significant losses.

224. West Prairie losses include the loss of sale of the Property, from diminution of the Property's value, and from ongoing carrying costs on the Property, in an amount of at least $16 million.

225. Conwin's losses include the loss of sale under the Purchase Agreement, from diminution of the Property's value, and from ongoing carrying costs on the Property, in the amount of $1 million.

**Fourth Cause of Action - Nuisance**

226. Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

227. Defendants' manufacture and/or sale and distribution of AFFF

constituted intentional, negligent, and/or unreasonably dangerous activity causing the unreasonable and substantial interference with the use and enjoyment of the property interests of the Plaintiffs.

228. Given the chemical properties of PFAS in AFFF, knew and/or should have reasonably foreseen that using AFFF at Fairchild as they intended would result in an invasion of the Plaintiffs' property interests. Through their actions described above, Defendants participated in carrying out the nuisance described above within the meaning of, inter alia, Chapter 7.48 RCW.

229. The unreasonable and substantial interference with the use and enjoyment of the Plaintiffs' property interests includes, but is not limited to, the contamination of groundwater and soil on the Property and the exposure to known toxic chemicals manufactured and/or sold and distributed by Defendants.

230. Defendants' sale and distribution of AFFF constitutes a pattern of continuous and ongoing tortious conduct.

231. On information and belief, Defendants have and continue to sell and distribute AFFF in a tortious manner to the date of this Complaint.

232. PFAS continue to contaminate the Property's groundwater.

233. The nuisance caused by Defendants resulted in, and continues to result in, contamination of the Property's groundwater.

234. Defendants' creation of a nuisance caused and is causing substantial

and unreasonable interference with Plaintiffs' property rights.

235. Defendants' acts were willful, wanton, or reckless and conducted with a reckless indifference to the rights and property of the Plaintiffs.

236. Defendants' conduct, and the resulting contamination of the groundwater by the chemical components of the Defendants' AFFF, caused the Plaintiffs to incur and/or should have reasonably foreseen that using AFFF at Fairchild as they intended would result in an invasion of the Plaintiffs' property interests. Through their actions described above, Defendants participated in carrying out the nuisance described above within the meaning of, inter alia, Chapter 7.48 RCW.

237. The unreasonable and substantial interference with the use and enjoyment of the Plaintiffs' property interests includes, but is not limited to, the contamination of groundwater and soil on the Property and the exposure to known toxic chemicals manufactured and/or sold and distributed by Defendants.

238. Defendants' sale and distribution of AFFF constitutes a pattern of continuous and ongoing tortious conduct.

239. On information and belief, Defendants have and continue to sell and distribute AFFF in a tortious manner to the date of this Complaint.

240. PFAS continue to contaminate the Property.

241. The nuisance caused by Defendants resulted in, and continues to result

in, contamination of the Property.

242. Defendants' creation of a nuisance caused and is causing substantial and unreasonable interference with Plaintiffs' property rights.

243. Defendants' acts were willful, wanton, or reckless and conducted with a reckless indifference to the rights and property of the Plaintiffs.

244. Defendants' conduct, and the resulting contamination of the groundwater by the chemical components of the Defendants' AFFF, caused the Plaintiffs to incur significant losses.

245. West Prairie losses include the loss of sale of the Property, from diminution of the Property's value, and from ongoing carrying costs on the Property, in an amount of at least $16 million.

246. Conwin's losses include the loss of sale under the Purchase Agreement, from diminution of the Property's value, and from ongoing carrying costs on the Property, in the amount of $1 million.

**Fifth Cause of Action – Declaratory Judgment**

247. Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

248. The Court has jurisdiction to award declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201, et seq.

249. An actual, present, and existing dispute exists between Plaintiffs and

Defendants. The parties have genuine and opposing interests, which are direct and substantial, relating to Defendants' liability and responsibility for Plaintiffs' damages incurred, and the future costs that Plaintiffs will incur to abate the continuing PFAS migration and contamination from Fairchild.

250. The possibility of Plaintiffs incurring future costs necessary to abate the continuing PFAS migration and contamination from Fairchild is not unlikely, remote, or speculative.

251. Plaintiffs are entitled to entry of a judgment declaring that Defendants are liable for damages and future costs necessary to abate the continuing PFAS migration and contamination from Fairchild, under Washington common law and federal statutory law. Such judgment shall be final, conclusive, and binding on any subsequent action or actions to recover further response costs or damages.

252. Plaintiffs further requests that this Court, after entering the declaratory judgment prayed for herein, retain jurisdiction over this action to grant Plaintiffs such further relief against Defendants as is necessary and proper to effectuate the Court's declaration, including an award of costs and entry of an injunction to implement a judgment entered on Plaintiffs claims under 28 U.S.C. § 2202.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment against Defendants, and each of them, jointly and severally, and grant the following

relief:

a) An award to Plaintiffs for all damages suffered, or that will be suffered, as a result of Defendants' actions, including, without limitation: costs to design, permit, construct, operate, and maintain, long-term filtration and treatment systems for the Property's contaminated wells, including those to install pipelines and other infrastructure; costs to design, permit, construct and maintain a connection to a viable public water system; costs to manage water quality; costs to collect and analyze samples of groundwater and other media; costs to hire professional services to develop and implement required filtration systems and additional testing; the decrease in the value and marketability of the Property; the loss of use and enjoyment of the Property; and the annoyance, discomfort, and inconvenience caused to the Plaintiffs by Defendants' PFAS releases to the environment—in an amount of at least $17 million;

b) An award to Plaintiffs, in an amount to be determined at trial, commensurate to the amount of an order for disgorgement of the profits and savings that were obtained by the unjust enrichment of Defendants through their manufacture and/or distribution and sale of AFFF;

c) A declaration that the Defendants are liable for damages suffered by Plaintiffs to date, and for costs to be incurred by Plaintiffs in the future to abate the continuing PFAS migration and contamination from Fairchild;

d) An order awarding to Plaintiffs' attorney fees and costs, as provided by law;

e) An award to Plaintiffs of pre- and post-judgment interest, as provided by law; and

f) An order and award to Plaintiffs for all such other and further relief, including equitable and declaratory, as the Court deems just and proper.

**JURY DEMAND**

Plaintiffs demand a trial by jury on all claims so triable.

Dated: June 17, 2024

/s/ *Stephen R. Parkinson*
Stephen R. Parkinson, WSBA 2111

*/s/ Stephen A. Weisbrod*
Stephen A. Weisbrod, WSBA 57821

*/s/ Thomas R. Oster*
Thomas R. Oster, WSBA 52880

**WEISBROD MATTEIS & COPLEY PLLC**
506 2nd Avenue, Suite 1400
Seattle, Washington 98104
sparkinson@wmclaw.com
sweisbrod@wmclaw.com
toster@wmclaw.com

***Attorneys for Plaintiff West Prairie Village MHP, LLC, and Conwin Enterprises, LLC***